UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH J. BERRY,

    Plaintiff,

v.

FORD MOTOR COMPANY,

    Defendant.
                                        /

Case No. 11-10569

Honorable John Corbett O'Meara

**OPINION AND ORDER
DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter came before the court on plaintiff Joseph J. Berry's January 14, 2015 motion for partial summary judgment and defendant Ford Motor Company's January 14, 2015 motion for summary judgment. The parties filed responses and reply briefs February 9, 2015, and February 26, 2015. Oral argument was heard April 2, 2015.

## PROCEDURAL BACKGROUND

When this case was initially removed to this court in February 2011, defendant Ford had applied for patents for its SYNC audio system, but they had not yet issued. Plaintiff Joseph Berry had filed a state court action, claiming the inventions were his, and sued for unjust enrichment and breach of contract. This court remanded the case; however, after the patents issued, the court vacated the order of remand.

Plaintiff's Fourth Amended Complaint alleges the following causes of action: Count I, unjust enrichment; Count II, fraud in the inducement; Count III, breach of contract; Count IV, "unenforceable agreement"; and Count V, correction of inventorship.

Plaintiff Berry has moved for summary judgment on Count I only; defendant Ford has moved for summary judgment on all counts.

## BACKGROUND FACTS

Prior to July 2006, Ford Motor Company decided to develop a system, later named "SYNC," that would be competitive with General Motors' OnStar system. The parties agree that around early September 2006, Doug VanDagens, a Ford representative, contacted Plaintiff and asked for his assistance in developing such a system. Plaintiff did assist Ford, most notably in showing the company how to automatically dial 911 legally and communicate by using touchtones from a cellular phone keyboard. Throughout the fall of 2006, Plaintiff worked on the system. In order to facilitate this work, Ford provided Plaintiff with an office, a computer, an email address and a Ford pass card enabling him to enter Ford premises. Plaintiff contends he worked at this endeavor "pretty much on a five day a week schedule throughout the fall until December 2006." Plaintiff's br. at 5. Plaintiff alleges that during that time period he was not given "any money for not only his conception of the new SYNC project, but also his work in developing the architecture necessary to implement the new SYNC project." Id.

Ford agrees that

> [b]etween September and November 2006, Plaintiff participated in several meetings with VanDagens and others at Ford relating to future versions of SYNC. There was no agreement regarding the confidentiality or ownership of the information provided by Plaintiff, and Plaintiff admits that he freely shared his ideas at these meetings without any agreement for compensation. Pl's dep. at 230-31, 237-38.

Defendant's br. at 2.

Ford contends that in November 2006, "VanDagens asked Plaintiff to consult for Ford on the development of future SYNC services . . . . It was agreed that in order to secure the services of

2

Plaintiff quickly, Ford would contract with John Zhu and his company LBS Solutions[;] and Plaintiff would work for Ford through LBS." Id. at 3. Zhu has testified that he agreed to Ford's terms and conditions and further that he understood that all intellectual property developed during the course of the LBS contract would be owned exclusively by Ford. Plaintiff admits that he performed services under the LBS Purchase Order, including writing LBS' final report to Ford.

The parties agree that beginning in April 2007 Plaintiff, under his newly-formed company JBJ Advisors ("JBJ"), entered into a subcontractor agreement with Ford to build certain aspects of the SYNC system. The 2007 agreement between the parties was comprised of several documents, including a Request for Quotation ("RFQ") and a Purchase Order ("PO"), each incorporating Fords' standard terms and conditions and related supplements. Ford issued and Plaintiff executed an RFQ to "design and develop the Service Delivery Network for SYNC Version 1.5 and 2.0." The RFQ requested that Plaintiff "[q]uote firm price and delivery of goods and services specified in accordance with [Ford's] standard terms and conditions and related supplements."

Section 8 of Ford's Professional Services Supplemental Terms and Conditions provides Ford with exclusive ownership of intellectual property as follows:

> Every invention, discovery and improvement made, conceived or reduced to practice in performing Contract Services belongs to [Ford], without further consideration, and shall be reported to [Ford] promptly. Upon request, Seller shall execute all documents and papers, and furnish all reasonable assistance required (i) to establish in [Ford] title to such inventions, discoveries and improvements and (ii) to enable [Ford] to apply for United States and foreign patents thereon.

Defendant's Ex. 8.

In addition to the RFQ and PO, Ford also issued a 2007 Statement of Work describing the services to be performed ("SOW"), Section 7 of which provides that Plaintiff "acknowledge[s] and agree[s] that any intellectual property that is developed and created based on this statement of work

for use in connection with SYNC, SYNC SDN and SYNC services shall be the property of Ford Motor Company." Defendant's Ex. 4, ¶ ¶ 7 and 21-22; Ex. A § 7.

In March 2008, Ford and JBJ entered into an amendment to the 2007 contract, increasing the previous contract price from $324,000 to $726,000. It too incorporated Ford's "standard terms and conditions and related supplements," providing for Ford's exclusive ownership of the intellectual property. Plaintiff claims he unilaterally modified the intellectual property provision to provide for co-ownership of it between Plaintiff and Ford and sent a revised SOW to Ford's Robert Johnson March 10, 2008, without notifying Johnson or anyone else at Ford of the change. Plaintiff acknowledges, however, that his revision to the SOW was a "proposal" to share ownership of the intellectual property and did not follow the process required for effective modification of Ford's terms and conditions: Ford "expressly reject[s]" any proposed modifications that are not accepted in writing by Ford. Defendant's Ex. 11 at 3. Furthermore, by performing under the PO, Plaintiff accepted Ford's terms and conditions, giving Ford exclusive ownership of the intellectual property.

Several months after the JBJ contract amendment, Ford hired Plaintiff directly as an employee. Effective December 1, 2008, Plaintiff became a Ford employee with a base salary of $275,000, a hiring bonus of $200,000, eligibility for an annual bonus targeted at $83,000, stock in the amount of $60,000, two leased vehicles, and other benefits. The Employment Agreement Plaintiff signed prospectively assigned all intellectual property "made, conceived or developed" by Plaintiff to Ford "without further consideration," and required Plaintiff's cooperation in the execution of patent assignments.

Ford contends that it terminated Plaintiff's employment in August 2009 after an investigation by its Human Resources Department. The investigation initially centered on a potential conflict of

4

interest involving Plaintiff and a Ford vendor; however, Ford claims other misconduct was highlighted during the process. For example, Plaintiff had represented in his employment application that he held a degree from Wayne State University even though he had no such degree. In addition, explicit images were discovered on Plaintiff's work computer; and Plaintiff later admitted that during the HR investigation, he had lied about the source of those images. Shortly after his termination, Plaintiff sought legal counsel and filed the instant suit.

## LAW AND ANALYSIS

In Count I of his Fourth Amended Complaint, Plaintiff alleges a claim for unjust enrichment.

> In order to sustain the claim of unjust enrichment, plaintiff must establish (1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant. If this is established, the law will imply a contract in order to prevent unjust enrichment. However, a contract will be implied only if there is no express contract covering the same subject matter.

Belle Isle Grill Corp. v. City of Detroit, 256 Mich. App. 463, 478 (2003). "The process of imposing a 'contract-in-law' or a quasi-contract to prevent unjust enrichment is an activity which should be approached with some caution." In re McCallum Estate, 153 Mich. App. 328, 335 (1986).

The RFQ's and PO's entered into by LBS and JBJ incorporate Ford's terms and conditions by reference. Those terms and conditions provided that every invention "made, conceived or reduced to practice in performing Contract Services belongs to [Ford], without further consideration," and obligated Plaintiff to execute assignment documents. Later, Plaintiff's Employment Agreement prospectively assigned to Ford every invention "made, conceived or developed" during his employment period. Therefore, defendant Ford is entitled to summary judgment on Plaintiff's unjust enrichment claim, as all of the inventions at issue are governed by

express contracts with LBS, JBJ or Plaintiff's Employment Agreement, all of which gave Ford exclusive ownership of the intellectual property at issue.

Plaintiff argues that he conceived *and* reduced to practice at least some of the inventions at issue prior to his contract periods. However, his allegations of reduction to practice are repudiated by his testimony that none of the inventions were made before May 1, 2007, the earliest date Plaintiff admits he was under contract with Ford. Defendant's Ex. 2 at 244-45, 820-27, and 835-36. Conception alone, without reduction to practice, is insufficient to remove the inventions from the scope of the agreements. In a case similar to Plaintiff's and with similar provisions in the relevant contract language, the United States Court of Appeals for the Federal Circuit recently held that the employee's inventions were covered by such agreements unless they had been both made *and* conceived prior to the employment period. Preston v. Marathon Oil Co., 684 F.3d 1276, 1285-86 (Fed. Cir. 2012). Due to the absence of physical manifestations or detailed drawings of plaintiff Preston's invention before his employment, the court found that "the invention was not reduced to practice (*i.e.,* made)" before his employment; therefore, all rights were assigned to the employer. Id. at 1286. In this case even if Plaintiff conceived of the inventions prior to signing any contract, they were not reduced to practice, made or developed prior to his entering into a contract with Ford. As a result, all of the inventions at issue are subject to Ford's contractual rights; and there has been no unjust enrichment.

In Count II Plaintiff alleges that he was fraudulently induced into assigning certain patents to Ford. As an initial matter, Plaintiff's claim fails because title to all of the inventions conceived or made by him vested in Ford pursuant to the contractual agreements discussed above. Therefore, even if, as Plaintiff alleges in Count II, the assignments were fraudulently induced, he is not entitled

6

to relief because Ford is still the proper owner of all intellectual property developed during the contract period.

To succeed in an action for fraudulent inducement, the plaintiff must prove by clear and convincing evidence the following factors: 1) the defendant made a representation of material fact, (2) the representation was false, (3) the defendant either knew the representation was false or made it recklessly, (4) the defendant intended that the plaintiff rely on the representation, (5) the plaintiff relied on the representation, and (6) the plaintiff suffered damages as a result. Hi-Way Motor Co. v. International Harvester Co., 398 Mich. 330, 336 (1976). To support a fraud claim, a material fact must be a false statement "of past or existing fact," rather than a future promise or opinion. Cooper v. Auto Club Ins. Ass'n, 481 Mich. 399, 416 (2008).

Plaintiff Berry alleges that in an October 2006 meeting, Jennifer Stec, in-house counsel for Ford, induced him to put inventions into the Ford system before working with Microsoft on SYNC services. In his deposition, Plaintiff testified that Stec said,

> We need to do this to protect the inventions from Microsoft because they get to take them. If–if you give them to them, according to the contract, they get to take them . . . . So, this would be–you know, this would be the best thing to do to protect ourselves.

Plaintiff's dep. at 693. In response, Plaintiff "made a joke that, well it wouldn't protect me, I don't work here . . . . And she said, it'll protect everybody . . . . She just laughed at the joke I was making." Id. As Plaintiff testified, Stec never told him that Ford would not use the invention-related information, and they did not discuss the patent application process. Id. at 713-14.

Plaintiff also bases his fraudulent inducement claim on an alleged misrepresentation by John Leroy, outside counsel for Ford. In 2007 or 2008 LeRoy allegedly told Plaintiff that Ford was filing for patents to protect "both the patent and Ford" from the scenario where "a guy who's just sitting

7

on his couch doing nothing and then, you know, he pulls up some patent and he comes after Ford." Id. at 715-20. The statements allegedly made by Stec and LeRoy are the only statements upon which Plaintiff relies in his allegations in Count II.

To support a fraud claim, a material fact must be a false statement "of past or existing fact." Stec's statement that placing the inventions in the Anaqua system would protect "everybody" from Microsoft and LeRoy's statement that Ford filed for patents to protect "both the patent and Ford" from third parties are opinions concerning future events and not factual statements that are actionable for fraud. "A plaintiff's subjective misunderstanding of information that is not objectively false or misleading" does not support a fraud claim. Hord v. Environmental Research Inst., 463 Mich. 399, 411 (2000). The statement are not objectively false or misleading because they do not address Plaintiff's rights to the inventions vis-a-vis Ford. Instead, they only concern Plaintiff's and Ford's rights with respect to third parties and are therefore immaterial to the instant cause of action.

Plaintiff also cannot show reasonable reliance. The alleged misrepresentations were not made in connection with the patent application itself nor does he explain how the statements induced him to execute patent assignments he would have executed but for the allegedly fraudulent statements. Moreover, as mentioned above, Plaintiff could not reasonably rely upon any statements by Ford regarding his rights to the inventions because the assignments assigned title to Ford and were inconsistent with Plaintiff's claimed sole ownership. In addition, the court notes that Plaintiff is a sophisticated party who had prior experience applying for patents and executing patent assignments in favor of Ameritech, his former employer. He understood the process and effect of the assignments and could not have reasonably relied upon Ford's representations.

Plaintiff's breach of contract claim alleged in Count III is premised on his allegations that the Statement of Work ("SOW") that formed the portion of the parties' agreement in 2007 did not include a provision entitling Ford to exclusive ownership of intellectual property and that he modified the SOW in 2008 to entitle him to co-ownership of it. However, even if, as he claims, the 2007 JBJ SOW did not include such a provision, Plaintiff had already agreed to provide Ford with exclusive intellectual property ownership through the terms and conditions incorporated into the RFQ and PO. Likewise, the 2008 RFQ and amended PO with JBJ incorporated Ford's terms and conditions giving Ford exclusive intellectual property ownership. Plaintiff's unilateral modification to the SOW was not binding on Ford. Furthermore, the PO that was subsequently issued incorporates Ford's terms and conditions. Plaintiff performed work under the contract, thereby accepting its terms and conditions and superseding any effort by Plaintiff to modify the terms regarding intellectual property ownership.

In Count IV Plaintiff requests that the court find his patent assignments unenforceable for lack of consideration. However, Ford's Supplemental Terms and Conditions, as well as Plaintiff's Employment Agreement, specifically provide that all inventions belong to Ford "without further consideration" and require Plaintiff to execute the necessary patent assignments. Exs. 8 and 13. Since Plaintiff was already obligated under his agreements to assign all intellectual property to Ford, no additional consideration was necessary apart from the compensation he was receiving under those agreements. The court notes that during the course of his three-year relationship with Ford, Plaintiff was well compensated, receiving in excess of $1,000,000 for his services.

Count V seeks substitution of Plaintiff as the sole named inventor for four patents that have issued. As part of his unjust enrichment claim in Count I, Plaintiff alleges sole inventorship in nine

additional applications. However, as the court has found above, Ford owns all of Plaintiff's inventions made or built after he contracted with Ford. He has no financial interest in the patents and therefore lacks standing to challenge their inventorship. See Larson v. Correct Craft, Inc., 569 F.3d 1319, 1324-27 (Fed. Cir. 2009).

Parties may seek correction of the inventors on an issued patent under Section 256 of the Patent Act. Eli Lilly & Co. v. Aradigm Corp., 376 F.3d 1352, 1358 (Fed. Cir. 2004); 35 U.S.C. § 256. However, "[t]he inventors as named in an issued patent are presumed to be correct." Hess v. Advanced Cardiovascular Sys., Inc., 106 F.3d 976, 980 (Fed. Cir. 1997). Therefore, a person seeking to be named as an inventor has a heavy burden; and the error must be shown by clear and convincing evidence. Vanderbilt Univ. v. ICOS Corp., 601 F.3d 1297, 1305 (Fed. Cir. 2010).

Testimony of the allegedly omitted inventor is insufficient to prove inventorship. Trovan, Ltd. v. Sokymat S.A., 299 F.3d 1292, 1302 (Fed. Cir. 2002). To satisfy the clear and convincing standard, conception must be proven by "corroborating evidence, preferably by showing a contemporaneous disclosure." Burroughs Wellcome Co. v. Barr Labs., Inc., 40 F.3d 1223, 1228 (Fed. Cir. 1994).

In discovery, Plaintiff identified all documents that allegedly evidenced his sole inventorship of the four challenged patents. These documents, however, were not authored by Plaintiff and were created long after Plaintiff's alleged dates of conception for the patented inventions. None of the documents explicitly identifies Plaintiff's contribution to the claimed inventions, and all four patents contain claim limitations that are not disclosed in any of the allegedly supporting documents. Plaintiff's failure to support conception of any single element in any claim with corroborating evidence dooms his request for correction of inventorship in those four patents. Moreover,

Plaintiff's attempt at correction fails because he has no evidence, let alone clear and convincing evidence, that the listed inventors did not contribute to *any* of the claims in those four patents.

Although not included in Count V, one application for which Plaintiff alleges sole inventorship has issued as Patent '325. However, even if Plaintiff were to amend Count V to include that patent, his claim would fail because he cannot substantiate his allegation of sole inventorship. In fact, during his deposition, Plaintiff admitted that he does not understand the subject matter of the first claim of the '325 Patent.

This court previously denied Plaintiff leave to include pending patent applications within Count V; however, Plaintiff has maintained his allegations of sole inventorship of those patent applications still pending. This court, though, is precluded "from determining the true inventor of an invention disclosed in a pending patent application." HIF Bio, Inc. v. Yung Shin Pharm. Indus. Co., Ltd., 600 F.3d 1347, 1355 (Fed. Cir. 2010).

Finally, Ford is entitled to summary judgment on its counterclaims for declaratory judgment and breach of contract against Plaintiff. As stated above repeatedly, Ford has established that its relationship with Plaintiff was governed by enforceable agreements which were breach by Plaintiff. These contracts gave Ford exclusive ownership of all of Plaintiff's inventions that were conceived, made or reduced to practice during his contractual and employment relationships with Ford and required Plaintiff to cooperate in the patent application process. It is undisputed that Plaintiff refused to execute documents to confirm Ford's ownership in patent applications. Plaintiff's refusal has caused a breach of his contractual obligations to Ford, and Ford has been damaged as a result of its inability to record its ownership interests in the patent applications it has filed. Therefore, Ford is entitled to judgment on its breach of contract claim and a judgment declaring that all of

Plaintiff's rights and interests in the inventions for which Plaintiff has refused to execute assignments are owned exclusively by Ford.

**ORDER**

It is hereby **ORDERED** that plaintiff Joseph Berry's January 14, 2015 motion for partial summary judgment is **DENIED.**

It is further **ORDERED** that defendant Ford Motor Company's January 14, 2015 motion for summary judgment is **GRANTED.**

> s/John Corbett O'Meara
> United States District Judge

Date:  April 14, 2015

I hereby certify that a copy of the foregoing document was served upon counsel of record on this date, April 14, 2015, using the ECF system.

> s/William Barkholz
> Case Manager